**Slip Op. 02-36**

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

| | | |
|---|---|---|
| THE COMMITTEE OF DOMESTIC STEEL WIRE ROPE AND SPECIALTY CABLE MANUFACTURERS, | : | |
| | : | |
| Plaintiff, | : | **Court No. 01-00209** **Public Version** |
| v. | : | |
| UNITED STATES, | : | |
| Defendant, | : | |
| and | : | |
| COOPER TOOLS, INC., DRAGON TRADING INC., and THE INDUSCO GROUP, | : | |
| | : | |
| and | : | |
| USHA MARTIN INDUSTRIES, LTD and USHA MARTIN AMERICAS, INC., | : | |
| | : | |
| and | : | |
| | : | |
| NANTONG WIRE ROPE CO. and NANTONG ZHONGDE STEEL WIRE ROPE | : | |
| | : | |
| Defendant-Intervenors. | : | |

[Plaintiff's Motion for Judgment Upon the Agency Record denied.]    Decided: April 5, 2002

*Harris Ellsworth and Levin, (Herbert E. Harris II), Jeffrey S. Levin,* for Plaintiff.

*(Lyn M. Schlitt),* General Counsel*, (James M. Lyons),* Deputy General Counsel, *(Michael Diehl),* Office of the General Counsel, U.S. International Trade Commission, for Defendant.

*Grunfeld, Desiderio, Lebowitz, Silverman, & Klestadt LLP, (Bruce M. Mitchell), Jeffrey S. Grimson,* for Defendant-Intervenors Cooper Tools, Inc., Dragon Trading Inc., and the Indusco Group.

*Wilkie, Farr & Gallaher, Christoper A. Dunn,* for Defendant-Intervenors USHA Martin Industries, Ltd and USHA Martin Americas, Inc.

*Manatt, Phelps & Phillips, LLP, (Jeffrey S. Neely)*, for Defendant-Intervenors Nantong Wire Rope Company and Zhongde Steel Wire Rope.

## OPINION

**BARZILAY, JUDGE:**

### I. INTRODUCTION

Plaintiff in this case is a committee of domestic steel wire rope producers challenging the United States International Trade Commission's ("ITC" or "Commission") final negative determination in *Steel Wire Rope from China and India,* 66 Fed. Reg. 18,509 (April 9, 2001), in which the Commission ascertained that steel wire rope imported from China and India caused neither material injury nor threat of material injury to the domestic industry. The Commission's reasoning was set forth in *Steel Wire Rope From China and India,*("*Final Determination*"), Inv. Nos. 731-TA-868-869, (Final), USITC Pub. 3406 (March 2001). Before the court is Plaintiff's USCIT R. 56.2 *Motion for Judgment Upon the Agency Record*. Plaintiff brings this action pursuant to 19 U.S.C. § 1516a(a)(2)(B)(ii) (1994); the ITC opposes Plaintiff's motion. Defendant-Intervenors Cooper Tools, Inc., Dragon Trading, Inc., and the Indusco Group ("Cooper Tools") and Nantong Wire Rope Company and Nantong Zhongde Steel Wire Rope ("Nangtong") also filed briefs opposing Plaintiff's motion. The court exercises jurisdiction

pursuant to 28 U.S.C. § 1581(c) (1994).[1]  For the reasons set out in the following opinion, the

court denies Plaintiff's *Motion for Judgment Upon the Agency Record.*


## II.  BACKGROUND

On March 1, 2000, Plaintiff filed with the U.S. Department of Commerce ("Commerce"

or "ITA") and the International Trade Commission a petition alleging that imports of steel wire

rope from India, Malaysia, the People's Republic of China ("China"), and Thailand were being,

or were likely to be sold, in the United States at less than fair value ("LTFV") within the

meaning of section 731 of the Tariff Act of 1930 and that such imports were the cause of

material injury to an industry in the United States.  *See Committee of Domestic Steel Wire Rope*

*and Specialty Cable Manufacturers Mem. in Supp. of Its Rule 56.2 Mot. for J. on the Agency R.*

("*Pl.'s Br.*") at 2-3.  The ITC initiated a preliminary investigation on March 1, 2000, in response

to the petition by instituting antidumping duty investigations Nos. 731-TA-868-871.  On March

17, 2000, Commerce initiated antidumping duty investigations to determine whether imports of

steel wire rope from China, India, Malaysia and Thailand were being sold, or were likely to be

sold, in the United States at LTFV.[2]  *Initiation of Antidumping Duty Investigations: Steel Wire*

---

[1]  28 U.S.C. § 1581(c) provides: "The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516A of the Tariff Act of 1930."

[2]  Section 732(b)(1) of the Tariff Act of 1930, codified at 19 U.S.C. § 1673a(b)(1) (1994), provides:

> An antidumping proceeding shall be initiated whenever an interested party
> described in subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this
> title files a petition with the administering authority, on behalf of an industry,
> which alleges the elements necessary for the imposition of the duty imposed
> by section 1673 of this title, and which is accompanied by information
> reasonably available to the petitioner supporting those allegations. The

*Rope From India, Malaysia, the People's Republic of China, and Thailand,* 65 Fed. Reg. 16,173 (March 27, 2000). The Commission issued a preliminary injury determination on April 17, 2000, finding by a 6 to 0 vote that steel wire imports from China, India and Malaysia materially injured, or threatened to materially injure, the U.S. steel wire rope industry. *Steel Wire Rope from China, India, Malaysia and Thailand,* 65 Fed. Reg. 24,505 (April 26, 2000).

On July 7, 2000, the Committee requested that Commerce postpone the issuance of its preliminary determination as to whether the steel wire rope was sold or likely to be sold in the United States at LTFV. On July 13, 2000, Commerce granted the request and postponed the issuance of its preliminary determination until September 25, 2000. *See Notice of Postponement of Preliminary Antidumping Duty Determinations: Steel Wire Rope from India, Malaysia, and the People's Republic of China*, 65 Fed. Reg. 45,037 (July 20, 2000). On September 25, 2000, Commerce issued an affirmative preliminary determination that steel wire rope from India and China were being sold in the United States for LTFV; however, Commerce issued a negative determination regarding steel wire imports from Malaysia. *See Notice of Preliminary Determination of Sales at Less Than Fair Value: Steel Wire Rope From India and the People's Republic of China*; *Notice of Preliminary Determination of Sales at Not Less Than Fair Value: Steel Wire Rope From Malaysia*, 65 Fed. Reg. 58,736 (October 2, 2000). In accordance with 19 U.S.C. § 1673d(b), Commerce notified the Commission of its preliminary determinations and the Commission began the final phase of its investigations. *See Steel Wire Rope From China, India, and Malaysia*, 65 Fed. Reg. 67,402 (November 9, 2000).

---

petition may be amended at such time, and upon such conditions, as the administering authority and the Commission may permit.

In its final determination, Commerce found that steel wire rope from India and China was being sold, or was likely to be sold, in the United States at less than fair market value and that steel wire rope from Malaysia was not being sold in the United States at less than fair value. *See Notice of Final Determination of Sales at Less Than Fair Value: Steel Wire Rope From India and the People's Republic of China*; *Notice of Final Determination of Sales at Not Less Than Fair Value: Steel Wire Rope From Malaysia*, ("*Commerce's Final Determination*"), 66 Fed. Reg. 12,759 (February 28, 2001). Additionally, Commerce found that steel wire rope produced by one of the Chinese respondents, Fasten, was not being sold in the United States at LTFV. Commerce determined that the final estimated dumping margins on the subject imports from China ranged from 42.23% to 58% and the final estimated dumping margin for subject imports from India was 38.63%. *Id.* at 12,761.

On March 21, 2001, the Commission determined by a vote of 6 to 0 that an industry in the United States was neither materially injured nor threatened with material injury by reason of imports of steel wire rope and transmitted its negative determination to Commerce. The Commission determined that a "reasonable overlap" of competition existed between the subject imports and the domestic like product and cumulated the subject imports from India and China. However, in its injury analysis, the Commission determined that the competition between the subject imports and the domestic like product was "attenuated" and therefore, did not materially injure or threaten to materially injure an industry in the United States.

The Committee argues that the Commission: (1) applied varying, inconsistent and irreconcilable characterizations regarding the degree of competition which existed in the U.S. steel wire rope market between the subject imports and the domestic like product, (2) improperly

concluded that "attenuated" competition existed between subject imports and the domestic like product, and (3) failed to consider the magnitude of the dumping margins established by Commerce in its material injury and threat of material injury analysis. *See Pl.'s Br.* at 6-8. Specifically, the Committee asserts that the Commission was inconsistent in determining that a "reasonable overlap" of competition existed for cumulation purposes, and at the same time finding that "attenuated" competition existed between the domestic product and subject imports, and therefore, concluding that the subject imports did not materially injure or threaten to materially injure the domestic industry. The Committee also asserts that the Commission's finding of "attenuated" competition between the subject imports and the domestic like product was flawed because it was not supported by substantial evidence. The Committee claims that "[t]here is little or no evidence on the record to indicate that Indian imports carry the same qualitative shortcoming claimed by the exporters and importers of steel wire rope from China" and "the Commission's analysis did not account for substantial evidence on the administrative record that establishes subject imports from both China and India are in direct competition in the U.S. marketplace." *Pl.'s Br.* at 7. Additionally, the Committee argues that the Commission failed to take into account the final estimated dumping margins that were determined by Commerce.

The Commission and Defendant-Intervenors argue that the Commission's findings were consistent. The Commission argues that in *both* the cumulation and injury determinations the Commission found "attenuated" competition between the subject imports and the domestic like product. However, the statutory standards used for cumulation and injury determinations differ and it is consistent to find that the level of product fungibility and competition may satisfy the

"reasonable overlap" standard of cumulation yet still be insufficient to support a finding that the subject imports caused material injury to the domestic industry. *See Def.'s Br.* at 13-18. The Commission asserts that substantial evidence on the record supports a finding that competition between subject imports and the domestic like product was "attenuated" due to differences in quality and product mix. Additionally, the Commission argues that its findings took into account all record evidence, which included the characteristics of the subject imports from India and all record evidence that was contrary to a finding of "attenuated" competition. *See Id.* at 17-18. In response to the Committee's claim that the estimated dumping margins were not considered in the *Final Determination*, the Commission claims "[t]he Commission need not discuss every statutory factor or party argument. Rather, it must address the most relevant factors and arguments such that the agency's path can reasonably be discerned." *Id.* at 3. Therefore, the Committee's argument that the Commission did not take into account dumping margins determined by Commerce "misapprehends the Commission's obligations in explaining the basis for its determinations." *Id*.


### III. STANDARD OF REVIEW

The Committee asks the court to hold that the Commission's *Final Determination* is unlawful. The court must evaluate whether the finding in question is supported by substantial evidence on the record or is otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence is "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938); *Matsushita Elec. Indus. Co., Ltd. v. United States,*

750 F.2d 927, 933 (Fed. Cir. 1984).  This court noted, "[i]n applying this standard, the court

affirms [the agency's] factual determinations so long as they are reasonable and supported by the

record as a whole, even if there is some evidence that detracts from the agency's conclusions."

*Olympia Indus., Inc. v. United States*, 22 CIT 387, 389, 7 F. Supp.2d 997, 1000 (1998) (citing

*Atlantic Sugar, Ltd. v. United States*, 744 F. 2d 1556, 1563 (Fed. Cir. 1984).

The court may not reweigh the evidence or substitute its own judgment for that of the

agency.  *See Granges Metallverken AB v. United States*, 13 CIT 471, 474, 716 F. Supp. 17, 21

(1989).  Substantial evidence is "something less than the weight of the evidence, and the

possibility of drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's finding from being supported by substantial evidence." *Id.*, 13 CIT at

475, 716 F. Supp. at 21 (citations omitted).  Additionally, absent a showing to the contrary, the

agency is presumed to have considered all of the evidence in the record.  *Nat'l Ass'n of Mirror*

*Mfrs. v. United States*, 12 CIT 771, 779, 696 F. Supp. 642, 648 (1988).  Thus, "to prevail under

the substantial evidence standard, a plaintiff must show either that the Commission has made

errors of law or that the Commission's factual findings are not supported by substantial

evidence." *Id.*, at 774, 696 F. Supp. at 644.

## IV. DISCUSSION

A.      *The Commission's material injury and threat of material injury analysis was in accordance with law and supported by substantial evidence.*

To determine if the steel wire rope industry was materially injured by reason of the subject imports, the Commission had to first define the industry and the domestic like product.[3] Additionally, the Commission was required by 19 U.S.C. § 1677(7)(G)(i) (1994) to cumulatively assess the volume and price effects of imports from all countries with respect to which petitions were filed and/or investigations self-initiated by Commerce on the same day, if such imports compete with each other and the domestic like product. In assessing whether to cumulate, the Commission applied the four-factor test it developed to determine if a "reasonable overlap" of competition existed between the subject imports and the domestic like product.[4] *See Final*

---

[3] 19 U.S.C. § 1677(4)(A) states: "[t]he term 'industry' means the producers as a [w]hole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."

19 U.S.C. §1677(10) states: "[t]he term 'domestic like product' means a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle."

The Commission's definitions of the industry and domestic like product are not in dispute, therefore, the court need not focus on that portion of the Commission's determination.

[4] The four factors considered are:

> (1)     the degree of fungibility between the subject imports from different countries and between imports and the domestic like product, including consideration of specific customer requirements and other quality related questions;

> (2)     the presence of sales or offers to sell in the same geographic markets of subject imports from different countries and the domestic like product;

*Determination* at 10.  In the final phase of the antidumping investigation, the ITC was required

to consider the volume of the subject imports, their effect on prices for the domestic like product

and other economic factors that are relevant to its determining whether the steel wire rope

industry in the United States was materially injured or threatened with material injury from the

subject imports.  *See* 19 U.S.C. § 1677(7)(B)(i) (1994); 19 U.S.C. § 1677 (7)(C)(iii) (1994).

In determining to cumulate, the Commission analyzed the subject imports from China

and India in relation to each other and the domestic like product and found that there was a

"reasonable overlap" of competition.  However, the Commission noted that

> [t]he record is . . . mixed regarding whether there is reasonable overlap of
> competition among the domestic like product and the subject imports from China
> and India.  The subject imports and the domestic like product are sold through
> overlapping channels of distribution, and were present throughout the period of
> investigation, and in all geographic areas of the United States.  Fungibility among
> the products is limited by the lower quality of subject imports from China and, to
> a lesser extent, subject imports from India.  The subject imports' higher
> concentration in galvanized carbon steel wire rope also limits fungibility.
> Nevertheless, producers, importers, and purchasers generally indicated that the
> subject product from China and India and the domestic like product are all at least
> sometimes interchangeable, and are often used in the same applications.

*Final Determination* at 20.  To support its conclusion, the Commission detailed the conditions of

competition in the United States market and cited this information in its determination.  *See*

*Final Determination* at 19-20 n. 79-84 (citing to Part II of the *Confidential Staff Report Steel*

---

(3)     the existence of common or similar channels of distribution for subject
        imports from different countries and the domestic like product; and

(4)     whether the subject imports are simultaneously present in the market.

*Final Determination* at 15 (citing *Certain Cast-Iron Pipe Fittings from Brazil, the Republic of Korea, and Taiwan*, Inv. Nos. 731-TA-278-280 (Final), USITC Pub. 1845 (May 1986), *aff'd Fundicao Tupy, S.A. v. United States,* 12 CIT 231*,* 678 F. Supp. 898, *aff'd* 859 F.2d 915 (Fed. Cir. 1988)).

*Wire Rope From China and India,* Inv. Nos 731-TA- 868-869 (Final) (March 9, 2001),

*Administrative Record*, List 2, Doc. 169 ("*Staff Report*"). The Commission analyzed the

channels of distribution, supply and demand considerations, substitutability issues, and the

supply and demand elasticity in the United States market. *Id*. Although the Commission did

find that there was "reasonable overlap" of competition which statutorily required that the

subject imports from China and India be cumulated, the Commission recognized that

competition between the domestic like product and the subject imports was "attenuated" due to

quality and product mix issues. *See Determination* at 16. This finding became particularly

relevant for the Commission's injury analysis in the final phase of the investigation.

In the injury determination analysis, the Commission is required to consider (1) the

volume of the imports, (2) their effect on prices for the domestic product, (3) their impact on

domestic producers of the domestic like product, but only in the context of production operations

within the United States, and (4) other economic factors that are relevant to the injury

determination.[5] In this case, the Commission determined that the domestic industry was not

---

[5] 19 U.S.C. § 1677(7)(B) (1994) provides:

(B) Volume and consequent impact

  In making determinations under sections 1671b(a), 1671d(b), 1673b(a), and 1673d(b)
of this title, the Commission, in each case--

    (i) shall consider--

        (I) the volume of imports of the subject merchandise,
        (II) the effect of imports of that merchandise on prices in the United States
        for domestic like products, and
        (III) the impact of imports of such merchandise on domestic producers of
        domestic like products, but only in the context of production operations

materially injured by reason of the subject imports sold in the United States at less than fair value.

The Commission, in evaluating the volume of imports, found that the increase in volume of imports from China and India did not adversely affect the United States producers' market share. It did, however, find that the market shares for nonsubject imports were negatively impacted by the increased volume of subject imports.

> The record also indicates that subject imports accounted for [ ] percent of U.S. apparent consumption in interim 1999, and [ ] percent in interim 2000. The U.S. producers' share, however, remained [ ] during the same period, at [ ] percent in interim 1999, and [ ] percent in interim 2000. The increase in share by the subject imports between interim 1999 and interim 2000 therefore came at the expense of nonsubject imports. That subject imports displaced nonsubject imports is consistent with record evidence that galvanized carbon steel wire rope made up more than one-half of subject imports, and almost half of nonsubject imports, but only a small share of domestic production.

*Final Determination* at 25-26 (footnotes omitted).

The Commission also used record evidence to establish that the price of the subject imports did not have significant price depressing effects on the domestic like product. *Final Determination* at 28. The Commission cited to specific record evidence that substantiated its

---

> within the United States; and

> (ii) may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports.

> In the notification required under section 1671d(d) or 1673d(d) of this title, as the case may be, the Commission shall explain its analysis of each factor considered under clause (i), and identify each factor considered under clause (ii) and explain in full its relevance to the determination.

finding that the subject imports did not negatively affect domestic like product prices.

> The Commission collected quarterly price information on seven types of steel wire rope, designated products 1 through 7. The volume of the sales of the domestic like product was very small in all but 1 and 2 (consisting of bright carbon steel wire rope) and product 5 (consisting of galvanized carbon wire rope). There was no clear downward trend in the price of domestically produced steel wire rope in any of these three product categories. For product 1, prices for the domestic product were highest at the end of the review. Prices for domestic product 2 increased and then fell during the period, but ended at a level [      ] above their starting point. Prices for the domestic product 5 ended [      ] lower than they began, but increased in each of the last three quarters.

*Final Determination* 26- 27 (footnotes omitted). Additionally, the Commission noted that the

substitutability between subject imports and the domestic like product was limited because

> subject imports generally are lower in quality than the domestic like product. Moreover, galvanized carbon steel wire rope accounts for over half of subject imports but only a small share of domestic production. These factors limit substitutability between the domestic like product and the subject imports, and therefore limit the potential effects on subject imports domestic prices.

*Final Determination* at 26. Similarly, the record evidence demonstrated that (1) petitioners

announced various price increases, (2) domestic producers' cost of goods sold as a percentage of

net sales increased minimally, while their operating income remained stable, and (3) the

"attenuated" competition between the subject imports and the domestic like product limited the

ability of the subject importers to suppress price increases of the domestic like product.

> We also found that subject imports did not have significant price depressing effects on the domestic like product. The record does not reflect any clear downward trend in prices for the domestic like product. Nor do we find that subject imports prevented to a significant degree price increases by the domestic industry that otherwise would have occurred. First, petitioners announced various price increases, which the record suggests were collected, in whole or in part, in at least some instances. Second, domestic producers' cost of goods sold as a percentage of net sales increased very little, while their operating income was generally stable. Third, because competition between subject imports and domestic like product is attenuated, subject imports' ability to suppress price increases is similarly limited.

*Final Determination* at 28-29 (footnotes omitted).

In its impact analysis, the Commission must consider all the relevant economic factors that bear on the state of the industry in the United States. *See* 19 U.S.C. § 1677(7)(C)(iii) (1994). The Commission noted that although the industry's performance was not particularly strong, the cause of the weakness was not the subject imports. In fact, the Commission found that the major reason for the domestic industry's market share loss was caused by *nonsubject* imports.

> Subject imports' market share increased less than [      ] from 1998 to1999, from [   ] to [   ] percent. While subject imports' market share was the highest in interim 2000, that was also the period the industry was most profitable. In addition, prices collected on various subject products did not exhibit a clear downward trend, and AUVs (average unit values) for the subject imports decreased only [     ] from 1998 to 1999, from $[    ] per short to $[    ] per short ton. Previously, from 1997 to 1998, the domestic industry lost [   ] in market share, but nonsubject imports accounted for the bulk of the loss [   ].

*Final Determination* at 33-34 (footnotes omitted).

In addition to the price, volume and impact analysis, the Commission also noted in its injury analysis important conditions of competition that supported its negative injury determination. The Commission found that

> although domestic and imported steel wire rope both generally conform to specifications, certain factors limit competition between them. More than one-half of subject imports are galvanized carbon steel wire rope, while less than two percent of domestic production is galvanized. Many purchasers and distributors state that only domestic product is used for so-called "critical" applications: those in which failure of the rope could result in damage, injury or death. Similarly, various steel wire rope distributors expressed concern over liability arising out of any failure by imported steel wire rope they might sell, particularly imports from China.

*Final Determination* at 22 (footnotes omitted). Similarly, a contributing factor to the domestic industry's drop in capacity, which caused a drop in production in 1999, could be attributed to

consolidation within the industry. In its impact analysis the Commission stated:

> [t]he decline in capacity in 1999 reflects the fact that domestic producer WRCA (Wire Rope Corporation of America) retired all but one of the production facilities it acquired from Rochester and Macwhyte. Domestic production capacity was 123,715 short tons in interim 1999 and 135,535 short tons in interim 2000, consistent with [
> ]. The domestic industry's production fell from 127,833 short tons in 1997, to 118,047 short tons in 1998, and to 108,655 short tons in 1999. However, production was higher in interim 2000, at 80,801 short tons, than in interim 1999, at 78,955 short tons.

*Final Determination* at 30-31 (footnotes omitted). Therefore, the Commission concluded that

purchasers' preference for domestic product and industry consolidation were significant factors

that supported a finding that subject imports did not cause material injury to the domestic

industry.

Having determined that the subject imports did not cause material injury to a domestic

industry, the Commission then focused its analysis to determine if the subject imports threatened

material injury to the domestic industry. Under 19 U.S.C. § 1677(7)(F)(ii) (1994), the

Commission is required to determine "whether further dumped or subsidized imports are

imminent and whether material injury by reason of imports would occur unless an order is issued

or a suspension agreement is accepted. . . ."[6]

---

[6] 19 U.S.C. § 1677(F) states the factors the Commission is required to consider in its threat of material injury determination.

> F) Threat of material injury
>
> (i) In general
>
> In determining whether an industry in the United States is threatened with material injury by reason of imports (or sales for importation) of the subject merchandise, the Commission shall consider, among other relevant economic factors--

(I) if a countervailable subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the countervailable subsidy is a subsidy described in Article 3 or 6.1 of the Subsidies Agreement), and whether imports of the subject merchandise are likely to increase,

(II) any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports,

(III) a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,

(IV) whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports,

(V) inventories of the subject merchandise,

(VI) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products,

(VII) in any investigation under this subtitle which involves imports of both a raw agricultural product (within the meaning of paragraph (4)(E)(iv)) and any product processed from such raw agricultural product, the likelihood that there will be increased imports, by reason of product shifting, if there is an affirmative determination by the Commission under section 1671d(b)(1) or 1673d(b)(1) of this title with respect to either the raw agricultural product or the processed agricultural product (but not both),

(VIII) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(IX) any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for

The Commission found that:

> [t]he record indicates that no significant increase in the volume or market penetration of subject imports is imminent. Although subject producers had the ability to increase significantly the volume of their exports to the U.S. market during the period of investigation, they did not do so. There is no persuasive evidence in the record that indicates that this behavior will change in the imminent future. We also find that subject imports are not likely to enter the United States at prices that will depress prices for the domestic like product. Prices for the subject imports are already significantly lower than prices for the domestic like product, yet prices for the latter are steady or increasing, and any market share lost by the domestic industry to subject imports has been small. We see no evidence that competition between subject imports and the domestic like product will become less attenuated in the imminent future.

*Final Determination* at 39-40. Therefore, the Commission concluded that the subject imports did not present a threat of material injury to the domestic industry. This determination is in accordance with law as the Commission discussed the relevant statutory factors that it considered in reaching its conclusion, namely, market penetration and volume of imports pursuant to 19 U.S.C. § 1677(F)(i)(III) and the effect of import prices on domestic prices

---

> importation) of the subject merchandise (whether or not it is actually being imported at the time).

> (ii) Basis for determination

> The Commission shall consider the factors set forth in clause (i) as a whole in making a determination of whether further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued or a suspension agreement is accepted under this subtitle. The presence or absence of any factor which the Commission is required to consider under clause (i) shall not necessarily give decisive guidance with respect to the determination. Such a determination may not be made on the basis of mere conjecture or supposition.

pursuant to 19 U.S.C. § 1677(F)(i)(IV).  It also cited attenuated competition between imports and

domestic production as another economic factor it considered relevant, as it is required to by 19

U.S.C. § 1677(F)(i).  The Commission's conclusions with regard to these economic factors find

factual support in the record as well.  In Part VII of its *Staff Report,* there is evidence that

supported its determination that the imports from China and India did not threaten a domestic

industry and these findings are included in its analysis.  In examining the capacity levels of the

importers as required by 19 U.S.C. § 1677(F)(i)(II) the Commission found that

> [t]he record shows no indication of increased capacity in China or India during the period of investigation that would indicate the likelihood of substantially increased imports of subject merchandise, and capacity is projected to be [      ] in 2000 and 2001 as it was in 1999.  Capacity utilization for the industry in China, which was estimated at [    ] percent in 1999, showed projected increases to rates of [    ] percent in 2000 and [    ] percent for 2001.  For the industry in India, capacity utilization was [    ] percent in 1999, and is projected to increase to [    ] percent in both 2000 and 2001.  While foreign producers' capacity utilization figures reflect some available excess capacity, unused capacity existed during the period investigated, but did not result in materially injurious exports to the United States.  Moreover, unused capacity declined late during the period of investigation, and it is projected to decline in the imminent future.

*Final Determination* at 37 (footnoting to the statistical tables included in Part VII of the *Staff*

*Report*).  Therefore, the court finds that the Commission's determination that there was no threat

of injury to the domestic industry is in accordance with law and supported by substantial

evidence in the record of the Commission's proceeding.

B.      *The Commission's cumulation and injury analyses did not apply inconsistent standards
        and its finding that "attenuated" competition existed between the subject imports and*

*domestic like product was supported by substantial evidence.*

The essence of the Committee's claim is that it was inconsistent for the Commission to find that a "reasonable overlap" of competition existed for cumulation purposes and also find that the competition between the subject imports and the domestic like product was "attenuated" and, therefore, did not contribute to material injury. On its face, this logic seems attractive. However, a closer examination of the different statutory schemes and criteria used in determining cumulation as opposed to material injury reveals that two distinct "competition" findings are logical and legally permissible. Particularly instructive on this issue was this court's holding in *BIC Corp. v. United States*, 21 CIT 448, 964 F. Supp. 391 (1997). In *BIC*, the domestic producer of disposable lighters (BIC Corporation), filed a petition with the Commission and Commerce alleging that the United States disposable lighter industry was materially injured, or threatened with material injury, by reason of subsidized and LTFV imports of disposable pocket lighters from Thailand and China. *See BIC,* 964 F. Supp. at 395. BIC claimed, *inter alia* that

> the Commission cannot legally justify its apparently inconsistent findings. BIC points out that the Commission found *sufficient fungibility* between the subject imports and BIC's lighters to support its finding of one like product, as well as its decision to cumulate. Yet, the Commission also found that there was *insufficient fungibility* between the two groups of lighters to negatively affect domestic prices and production. BIC asserts that such contradictory findings cannot pass legal muster.

*Id.* at 397 (emphasis in original).

Judge Goldberg articulated that determinations regarding like product, cumulation and causation require the application of different statutory schemes.

> [BIC's] argument fails because BIC again overlooks the importance of context; like product, cumulation, and causation are functionally different inquiries

> because they serve different statutory purposes. As a result, each inquiry requires a different level of fungibility. Hence, the record may contain substantial evidence that two products are fungible enough to support a finding in one context (e.g., one like product), but not in another (e.g., cumulation or causation).

*Id.* at 399 (citations omitted). The court noted that "to support a decision to cumulate, the Commission need only find a "reasonable overlap" of competition between the subject imports, and between the subject imports and the domestic like product. *Id.* at 400 (citations omitted). However, the court clearly stated that the standards used in different parts of the investigation were dependent on the context of the analysis. The rationale employed by the court regarding the application of different statutory schemes delineated the differences in the standards used in determining like product, cumulation, and material injury.

> Indeed, BIC ignores previous cases in which the court has consistently recognized that the Commission's inquiry into product substitutability, i.e, to what degree two or more products compete with each other, may differ according to context:
>
>> Analysis of substitutability varies according to the context of its application. For the purposes of defining "like product" as described in 19 U.S.C. § 1677(10)(1988), it is not necessary that like products be completely substitutable, only that the like product be like, or in the absence of like, most similar in characteristics and uses. For purpose of cumulation, the analysis of substitutability is also not stringent, as only a reasonable overlap in competition is required where like product imports compete with each other and with like products of the domestic industry. In analysis of material injury, substitutability is one factor in the evaluation of volume and price.

*Id.* at 397-98 (quoting *R-M Indus., Inc. v. United States*, 18 CIT 219, 226 n. 9, 848 F. Supp. 204, 210 n. 9 (1994) (citations and internal quotations omitted).

The rationale employed in *BIC* is applicable to the case before the court. The antidumping duty statutes set forth different statutory requirements and criteria for cumulation, material injury, and threat of material injury. *See* 19 U.S.C. § 1677(7)(G),(H); 19 U.S.C. §

1677(7)(A),(B),(C),(D),(E); 19 U.S.C. § 1677(7)(F).  In determining whether to cumulate, the Commission need only find a "reasonable overlap" of competition to support cumulation of the subject imports because the purpose of cumulation is to "ensure that the injury test adequately addressed *simultaneous* unfair imports from different countries."  *Ranchers-Cattlemen Action Legal Foundation v. United States*, 23 CIT 861, 880 74 F. Supp. 2d 1353, 1370 (1999) (quoting House Comm. on Ways and Means, Trade Remedies Reform Act of 1984, H.R. Rep. No. 98-725, at 37 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5127, 5164 (emphasis added)).  In determining if a domestic industry in the United States was materially injured or threatened with material injury, the Commission must determine if the subject imports were the *cause* of the material injury or threat of material injury.  *See Gerald Metals, Inc. v. United States*, 132 F.3d 716, 722 (Fed. Cir. 1997).  In determining causation, "*fungibility plays a far more important role in the causation context than in either the like product or cumulation contexts; the more fungible two products are, the more likely underselling by one will affect the price of the other*."  *BIC*, 964 F. Supp. at 400 (emphasis in the original and citations omitted).  Unlike the "reasonable overlap" of competition standard used in cumulation determinations, in its causation analysis the Commission must determine the effects of the subject imports on the volume and price of the like product, as well as their impact on the affected domestic industry.  Therefore, it was consistent for the Commission to determine in the context of cumulation that a "reasonable overlap" of competition existed, yet in the context of its causation analysis determine that the competition was "attenuated" and did not materially injure or threaten material injury to the domestic industry.

It is clear from the record evidence in this case that the Commission could have

concluded for purposes of cumulation that a "reasonable overlap" of competition existed, yet the competition was "attenuated" and did not cause or threaten material injury to a domestic industry. In fact, in both its cumulation and injury analyses, the Commission found "attenuated" competition. In its cumulation analysis, the Commission found that "although the record also indicates that competition between the domestic like product and subject imports, in particular those from China, is "attenuated" due to quality and product mix issues," it decided that cumulation was appropriate because (1) "imports and the domestic like product are sold through overlapping channels of distribution," and (2) "producers, importers, and purchasers generally indicated that the subject product from China and India, and the domestic like product are all at least sometimes interchangeable, and are often used in the same applications." *Final Determination* at 16, 20. However, in evaluating the volume and price effects in the context of the conditions of competition that characterize the domestic market, the Commission stated that differences in product mix and quality, limited competition between the imports and the domestic like product. *Id.* at 22.

To support its findings, the Commission detailed the reasons why the competition between the subject imports and the domestic like product was "attenuated." In its volume, price, and impact analysis, the Commission found that (1) differences in quality and product mix limited substitutability between the subject imports and the domestic like product, (2) the subject imports did not decrease domestic market share, adversely affect the domestic volume, or depress the prices of the domestic like product, and (3) the subject imports displaced the market share of nonsubject imports. *See Final Determination* at 26-28, 33-34; *infra* Section C. These findings were particularly evident for the subject imports from China. *See Final Determination*

at 17, 22. Although the findings of the Commission as to the subject imports from India were not as pronounced, the Commission supported its "attenuated" competition finding in regard to the subject imports from India with substantial evidence.

Contrary to the Committee's claims, the Commission did take into account all relevant facts on the record when it analyzed the level of competition between the subject imports from India and the domestic like product. In fact, the Commission noted that the subject imports from India were not as inferior as the subject imports from China. The Commission found that distributors had concerns about potential liability arising out of the failure of imported steel wire rope from China in critical applications, yet "[s]ome subject merchandise from India is high-strength carbon steel wire rope, used in critical applications, but the majority of the subject merchandise from that country is of standard varieties." *Final Determination* at 19 (footnote omitted). Similarly, the Commission noted that fourteen of seventeen importers reported that steel wire rope imports from India were "always," "frequently," or "sometimes" interchangeable with the domestic like product. *Final Determination* at 19. Although the quality of the subject imports was superior to that of the subject imports from China, product mix and quality differences as compared to the domestic like product supported that "attenuated" competition existed between the subject imports from India and the domestic like product.

The total amount of steel wire rope imported into the United States from India was predominately galvanized products. *See Final Determination* at 20, 22 (footnoting to the *Staff Report* at D-4, D-7.) However, domestic production of galvanized steel wire rope accounted for only 2% of the entire steel wire rope market. *See Final Determination* at 20. Additionally, interchangeability between galvanized steel wire rope and bright (non-galvanized) carbon steel

wire rope was limited. *Id.* at 7. Since galvanized steel is more corrosive resistant than bright

carbon steel, carbon steel wire rope cannot be substituted for galvanized steel wire rope in

applications where corrosion resistance is critical. *Id*. Similarly, the galvanized subject imports

cannot be substituted for stainless steel wire rope in applications where cleanliness or reduced

magnetic properties are required. *Id*. Therefore, nearly half the imports from India were

competing with a very small percentage of the domestic wire rope market.

Additionally, there was evidence on the record that the subject imports from India were

inferior to the domestic like product. Of the seventeen responding importers, only five stated

that the subject imports from India and the domestic like product were "always" interchangeable,

six reported that the two were only "sometimes" interchangeable and three reported that they are

"never" interchangeable. *Id* at 19 n. 80 (citing to the *Staff Report*, Table II-4 at II-10).[7] The

Commission also found that out of eight responding purchasers, four found the quality of the

subject imports from India comparable with the domestic like product while three rated the

quality of the domestic product as superior. *Id*. at 19. Only one purchaser rated the steel wire

rope imports from India as higher in quality than the domestic like product. *Id*. (footnoting to

the *Staff Report*, Table II-8 at II-14).

The Commission's "attenuated" competition finding was critical to the material injury

determination because the difference in product quality and mix, coupled with the low

substitutability of the subject imports with the domestic like product showed that the domestic

industry was not injured by the subject imports. Therefore, the Commission properly found that

although the competition between the subject imports and the domestic like product was

---

[7] The source of the information used in the *Staff Report* Table was compiled from responses to Commission questionnaires.

"attenuated," there was a "reasonable overlap" of competition to sustain cumulation. Similarly,

the Commission supported its conclusion that "attenuated" competition existed between the

subject imports and the domestic like product.[8]


C.      *The Commission considered Commerce's dumping margin determinations in the context*
        *of its findings.*

Commerce in its final dumping determination found the dumping margins on the subject

imports from China ranged from 42.23% to 58% and the final estimated dumping margin for

subject imports from India was 38.63%. *Commerce's Final Determination* at 12,761. The

magnitude of the dumping margin is one of the subfactors listed 19 U.S.C. § 1677(7)(C)(iii) that

the Commission is required to consider when examining the impact of the subject imports on the

affected industry.   At issue is subfactor (V) of the statute. Section 1677(7)(C)(iii) states:


   (iii) Impact on affected domestic industry

        In examining the impact required to be considered under subparagraph
   (B)(i)(III), the Commission shall evaluate all relevant economic factors which
   have a bearing on the state of the industry in the United States, including, but not
   limited to–

        (I) actual and potential decline in output, sales, market share, profits,
        productivity, return on investments, and utilization of capacity,
        (II) factors affecting domestic prices,
        (III) actual and potential negative effects on cash flow, inventories,
        employment, wages, growth, ability to raise capital, and investment,
        (IV) actual and potential negative effects on the existing development and
        production efforts of the domestic industry, including efforts to develop a
        derivative or more advanced version of the domestic like product, and

---

[8] In its threat of material injury analysis, the Commission also found that "because the
'attenuated' competition between the subject merchandise and the domestic like product, due to
the differences in quality and product mix discussed earlier," the subject imports did not threaten
to materially injury an industry in the United States. *Final Determination* at 38.

(V) in a proceeding under part II of this subtitle, the magnitude of the margin of dumping.

The Commission shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry.

Subfactor (V) was added as an amendment in the Uruguay Round Agreements Act of 1994

("URAA"). *See* 19 U.S.C. § 1677(7)(C)(iii); *See also Statement of Administrative Action*,

("*SAA*"), H.R. Rep. 103-826(I), 850 *reprinted in* U.S.C.C.A.N. 4040, 4184 (1994). The

legislative history accompanying subfactor (V) states:

b.      Impact on Affected Domestic Industry; Consideration of Dumping Margin

Section 222(b)(1)(B) of H.R. 5110 amends section 771(7)(C)(iii) of the Act by adding the magnitude of the margin of dumping to the list of factors the Commission considers in determining the impact of imports of subject merchandise on domestic producers of like products. There is no similar provision in the Subsidies Agreement and, as under current practice, the Commission will not be required to consider the rate of subsidization. This amendment does not alter the requirement in current law that none of the factors which the Commission considers is necessarily dispositive in the Commission's material injury analysis.

*SAA* at 850.

The Committee argues "[t]he final determination does not evidence any indication that the Commission evaluated the magnitude of the dumping margins with regard to their impact on domestic producers of domestic like product." *Pl.'s Br.* at 21 (footnotes omitted). The Committee claims that the magnitude of the dumping margins have a strong and direct bearing on the level of competition that exists between the subject imports and the domestic like product. The Committee alleges that the reason why the subject imports are being sold in the United States market at substantial dumping margins is because the subject imports are in direct competition with the domestic like product.

Defendant claims that "the Committee conflates the statutory distinction between what

the Commission must *consider*, and what it must *discuss. . . .*" *Def.'s Br.* at 32 (emphasis in

original).  Defendant concedes that the Commission is required to consider the dumping margins,

but since the "path to the agency's determination can reasonably be discerned" no additional

discussion of the magnitude of the dumping margin was required.  To support the argument,

Defendant asserts that case law supports the proposition "that the Commission need not discuss

every statutory factor, or address every party argument" *Def.'s Br.* at 35.

The court is not persuaded by the Committee's argument.  The record evidence indicates

that, although not directly discussed, in its final determination the Commission considered the

dumping margins in its material injury analysis.  Since the enactment of the URAA, the

Commission is required to consider the dumping margin in its analysis of the impact on the

affected industry.  However, none of the statutory factors that the Commission is required to

consider are necessarily dispositive.  *See SAA* at 850.  In this instance, the Commission

specifically noted its duty to consider the dumping margin.[9]  Additionally, in its *Staff Report*, the

Commission used a COMPAS model, which uses the dumping margins, to measure the

---

[9]  In its findings, the Commission stated:

> [t]he statute instructs the Commission to consider the "magnitude of the
> dumping margin" in an antidumping proceeding as part of its
> consideration of the impact of imports.  19 U.S.C. § 1677(7)(C)(iii)(V).  In
> its final dumping determination, Commerce determined dumping margins
> of 38.63 percent for India and 42.23 to 58 percent for China, except for
> Chinese producer Fasten, whose margin was <u>de minimis.</u>  66 Fed. Reg.
> 12759, 12761 (Fed. 28, 2001)

*Final Determination* at 30 n. 127.

economic effects of the subject imports on the domestic industry.[10]

> [T]he staff selects a range of estimates that represent price-supply, price-demand,
> and product substitution relationships (i.e., elasticities of supply, demand, and
> substitution) in the U.S. market for steel wire rope.  The model uses these
> estimates with the data on market shares and Commerce's dumping margins to
> analyze the likely effect on the U.S. like-product industry of reducing the subject
> imports from China and India.

*Staff Report* at E-3.  The use of the COMPAS model revealed little change to the domestic

industry absent dumping.

> [t]he results for the steel wire rope for China show that absent dumping the
> domestic price would have been [   ] to [   ] percent higher, the domestic output
> would have been [   ] to [   ] percent higher, and domestic revenue would have
> been [   ] to [   ] percent higher.  The results for all steel wire rope from India
> show that in the absent [sic] dumping the domestic price would have been [   ] to [
>   ] percent higher, the domestic output would have been [   ] to [   ] percent higher,
> and domestic revenue would have been [   ] to [   ] percent higher.

*Staff Report* at E-3 (citing to table E-1 and E-2).  Further, as the Defendant-Intervenors point out,

during a hearing, the Commissioners asked questions relating to both Commerce's dumping

margin determinations and the margin of underselling and specifically asked why the significant

margins did not appear to negatively affect domestic prices or market share.[11]  *See*

---

[10]  As described in the *Staff Report* "[s]uch models, also known as Armington models, are
relatively standard in applied trade policy analysis and are used extensively for the analysis of
trade policy changes both in partial and general equilibrium." *Staff Report* at E-3.

[11] In a post-submission hearing, Commissioner Bragg asked:

> I guess I'm going to at least start out my first two questions directing them
> to the lawyers amongst you, and that would be, Mr. Levin, since you did end on
> the subject of both margins, as well as the role of non-subject imports, I would
> like to hear a little bit more from you on both of those subjects.

> The first would be margins, and the first question would be again
> tell me what the relevance is of Commerce's final *de minimis* determinations to
> our injury analysis in these investigations.  You have not spent a lot of time on
> this, and I would like to hear a little bit more about it now and hope that you

*Administrative Record*, List 1, Doc. 56, *Transcript* at 56, 73 ("*Transcript*"). However, since the

Commission found that the competition between the subject imports and domestic like product

was "attenuated," it reasoned that the dumping margins did not impact the domestic industry.

The dumping margin has little significance if there is no connection between the pricing of the

foreign product and the condition of the domestic industry.

In its determination, the Commission found that the subject imports did not adversely

affect the domestic like product's pricing, volume or market share.

> Importantly, domestic prices were relatively stable over the period of
> investigation, despite the fact that subject imports consistently undersold domestic
> steel wire rope products 1, 2, and 5 by margins generally in excess of [ ] percent,
> and ranging from [ ] to [ ] percent. Nor did underselling result in significant
> gains in market share by imports at the expense of the domestic like product, as
> described above. That price underselling did not result in declining prices for the
> domestic like product or loss of market share reflects the limited substitutability
> between subject imports and the domestic like product. Additionally, although
> lost sales or lost revenues may constitute anecdotal evidence of direct price
> competition, there were few confirmed lost sales in these investigations, and the
> volume of confirmed lost sales was relatively small. On the basis of the
> conditions of competition in this industry and attenuated competition between

> would provide us some additional information in the post-hearing submission. . . .

*Transcript* at 56.

Commissioner Hillman questioned:

> I guess I want to start a little bit with the same line of questioning, which
> is in reading through the data and looking at this case, one of the things that is
> somewhat remarkable I think to all of us is that we've seen these large margins of
> underselling and yet what appears to be a relatively small, if not insignificant,
> change in either market share by the imports or price declines.
> I guess I'm still trying to understand if there is all of this product
> available, subject and nonsubject alike, you know, available at significantly lower
> prices, how is it that the domestic industry has again not lost significant market
> share and we've not seen significant price declines?

*See Transcript* at 73.

> subject imports and domestic like product, we conclude that price underselling by the subject imports of the domestic like product was not significant.

*Final Determination* at 27-28 (footnotes omitted).  In fact, the Commission found that the

subject imports adversely impacted *nonsubject* imports.  *See Final Determination* at 25; *supra*

*Section A*.  This was because the competition between the subject imports and domestic like

product was "attenuated" and limited substitutability between the subject imports and the

domestic like product.

> We consider underselling and price effects in the context of conditions of competition for steel wire rope.  As described previously, subject imports generally are lower in quality than the domestic like product.  Moreover, galvanized carbon steel wire rope accounts for over half of subject imports but only a small share of domestic production.  These factors limit substitutability between the domestic like product and subject imports, and therefore limit potential effects on subject imports domestic prices.

*Final Determination* at 26.

The Commission did not have to directly discuss the dumping margin because it was

implicit in its competition and injury analyses.[12]  In essence, the dumping margins were not

dispositive because the prices charged by the foreign importers did not affect the prices, volume,

or market share of the domestic industry.  The Commission correctly found that the "attenuated"

competition that existed between the subject imports and the domestic like product was the

dispositive reason that the subject imports failed to materially injure the domestic industry.

Thus, the substantial dumping margins did not affect the domestic industry because the subject

_____

[12]  The Commission's implicit consideration of the magnitude of the dumping margin is acceptable here because of the particular facts and circumstances of this antidumping investigation.  It is less clear that claiming "implicit consideration" of a statutory factor will allow the Commission to circumvent the statutorily mandated requirements of 19 U.S.C. § 1677(7)(C)(iii) in future investigations. On the contrary, the court notes that an explicit discussion of the roll of the dumping margin in injury determinations would better serve the statute.

imports were not substitutable with the domestic like product. Therefore, the subject imports did not materially injure or threaten to materially injure an industry in the United States because the subject imports did not adversely affect the domestic industry's prices, volume or market share.

## V. CONCLUSION

For the foregoing reasons, the court holds that the ITC's final negative determination in *Steel Wire Rope From China and India,* Inv. Nos. 731-TA-868-869, (Final), USITC Pub. 3406 (March 2001) is supported by substantial evidence and in accordance with law. Therefore, the court denies Plaintiff's *Motion for Judgment Upon the Agency Record.* Judgment will be entered accordingly.

Dated: _____                                    _____
      New York, NY                                                   Judith M. Barzilay
                                                                Judge