SLIP OP. 03-56

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

_____

                              :

COMMITTEE FOR FAIR COKE TRADE AND UNITED   :
STEELWORKERS OF AMERICA, AFL-CIO/CLC,       :

                              :

        PLAINTIFFS,                   :

                              :

        V.                       :      COURT NO. 01-00826

                              :

UNITED STATES OF AMERICA AND THE UNITED   :
STATES INTERNATIONAL TRADE COMMISSION,    :

                              :

        DEFENDANTS,              :

                              :

        AND                   :

                              :

CITIC TRADING COMPANY, LTD., MINMETALS    :
TOWNLORD TECHNOLOGY, LTD., DUFERCO, SA,  :
MITSUBISHI CHEMICAL CORPORATION, AND    :
MITSUI MINING COMPANY, LTD.,           :

                              :

        DEFENDANT-INTERVENORS.  :

_____ :


[United States International Trade Commission's negative preliminary injury determination remanded for further proceedings in conformity with this opinion.]


                             Dated: May 20, 2003

*Gardner, Carton & Douglas, LLC* (*W.N. Harrell Smith, IV*; *Wallace C. Solberg*; *Peter C. Koch*), for Plaintiffs Committee for Fair Coke Trade and United Steelworkers of America, AFL-CIO/CLC.

*Lyn M. Schlitt*, General Counsel, United States International Trade Commission; *James M. Lyons*, Deputy General Counsel, United States International Trade Commission (*Karen Veninga Driscoll*), for Defendant.

*Manatt, Phelps & Phillips, LLP* (*Jeffrey S. Neeley*), for Defendant-Intervenors CITIC Trading Company, Ltd. and Minmetals Townlord Technology, Ltd.

*White & Case, LLP* (*Walter J. Spak*; *Adams C. Lee*; *Frank H. Morgan*), for Defendant-Intervenor Duferco, SA.

*Cleary, Gottlieb, Steen & Hamilton* (*Donald L. Morgan*), for Defendant-Intervenor Mitsubishi Chemical Corporation.

*Bingham McCutchen, LLP* (*Roger L. Selfe*), for Defendant-Intervenor Mitsui Mining Company, Ltd.

OPINION AND ORDER

*EATON*, *Judge*: This matter is before the court on the motion for judgment upon the agency record, pursuant to USCIT R. 56.2, of the Committee for Fair Coke Trade[1] and United Steelworkers of America, AFL-CIO/CLC ("Plaintiffs") contesting the negative preliminary injury determination of the United States International Trade Commission ("ITC" or "Commission") contained in Blast Furnace Coke From China and Japan, Inv. Nos. 731-TA-951–952 (Prelim.), USITC Pub. 3444 (Aug. 2001), Pub. R. List 1, Doc. 59 ("Preliminary Determination").[2] The ITC

---

[1]     The Committee for Fair Coke Trade is a trade association whose members are producers of blast furnace coke in the United States. Compl. ¶ 3. Members of the Committee for Fair Coke Trade are: Acme Steel Co.; DTE Energy Services, Inc.; Koppers Industries, Inc.; and Shenango, Inc. *Id.*

[2]     Citations are to the public versions of the Preliminary Determination, the accompanying staff report, *see* Staff Report, Blast Furnace Coke From China and Japan, Inv. Nos. 731-TA-951–952 (Prelim.), USITC Pub. 3444 (Aug. 2001), Pub. R. List 1, Doc. 59 ("Staff Report"), and briefs submitted by Plaintiffs, *see* Pls.' Mem. Supp. Mot. J. Agency R. ("Pls.' Mem."), and the ITC, *see* Def.'s Mem. Opp'n Pls.' Mot. J. Agency R. ("Def.'s Resp."). Where the court discusses the postconference briefs submitted to the ITC on behalf of Duferco, SA, *see* Duferco, SA's Postconference Br., Pub. R. List 1, Doc. 35 ("Duferco Brief"), and on behalf of Mitsubishi Chemical Corporation and Mitsui Mining Company, Ltd., *see* Mitsubishi Chem. Corp.'s and Mitsui Mining Co., Ltd.'s Postconference Br., Pub. R. List 1, Doc. 38 ("Joint Japanese Brief"), the court limits its discussion to the nonconfidential portions of those briefs.

opposes this motion and urges the court to sustain its Preliminary Determination. The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(1)(C). For the reasons set forth below, the court remands this matter to the ITC for further proceedings in accordance with this opinion.

BACKGROUND

On June 29, 2001, Plaintiffs filed a petition alleging that an industry in the United States was materially injured or threatened with material injury by reason of less than fair value imports of blast furnace coke from the People's Republic of China and Japan ("Subject Imports").[3] *See* Certain Blast Furnace Coke Prods. From the P.R.C. and Japan, 66 Fed. Reg. at 39,009; Blast Furnace Coke From China and Japan, 66 Fed. Reg. 35,669 (ITC July 6, 2001) (institution of antidumping investigations). The ITC conducted preliminary antidumping duty investigations and issued the Preliminary Determination, finding that there was no reasonable indication that an industry in the United States was materially injured or threatened with material injury within the meaning of 19 U.S.C. § 1673b(a) by reason of the Subject Imports. *See* Blast Furnace Coke From China and Japan, 66 Fed. Reg. 45,692 (ITC Aug. 29, 2001) (prelim. determination). This negative preliminary determination terminated the investigations. *See* 19 U.S.C. § 1673b(a)(1) ("If the Commission finds that imports of the subject merchandise are negligible or otherwise

---

[3]        The scope of the ITC investigations covered "[b]last furnace coke made from coal or mostly coal and other carbon materials, with a majority of individual pieces less than 100 MM (4 inches) of a kind capable of being used in blast furnace operations, whether or not mixed with coke breeze." Certain Blast Furnace Coke Prods. From the P.R.C. and Japan, 66 Fed. Reg. 39,009 (Dep't Commerce July 26, 2001) (notice of initiation of antidumping investigations). "[C]oke breeze is the fine screenings from crushed coke used predominantly as a fuel source in the process of agglomerating iron." Staff Report at I-5 n.10.

makes a negative determination under this paragraph, the investigation shall be terminated.”).


STANDARD OF REVIEW

When considering an ITC preliminary determination in the context of an antidumping

review, “[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .” 19

U.S.C. § 1516a(b)(1)(A). The court, in reviewing the ITC’s decision, must “ascertain whether

there was a rational basis for the determination.” *Ranchers-Cattlemen Action Legal Found. v.*

*United States*, 23 CIT 861, 878, 74 F. Supp. 2d 1353, 1369 (1999) (citing *Torrington Co. v.*

*United States*, 16 CIT 220, 223, 790 F. Supp. 1161, 1167 (1992)); *see also id.* (quoting *Conn.*

*Steel Corp. v. United States*, 18 CIT 313, 315, 852 F. Supp. 1061, 1064 (1994)) (“The Court may

only reverse the ITC’s determination if there is a ‘clear error’ of judgment and where there is ‘no

rational nexus between the facts found and the choices made.’”). Nonetheless, the ITC’s

conclusions must be based on evidence, not conjecture, and in no event may the court “supply a

reasoned basis for the agency’s action that the agency itself has not given . . . .” *Bowman*

*Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) (citing *SEC v. Chenery*

*Corp.*, 332 U.S. 194, 196 (1947)); *see also Altx, Inc. v. United States*, 26 CIT __, __, Slip Op. 02-

154 at 4 (Dec. 31, 2002) (“The court can only review the reasoning that the Commission

expresses.”).


In the course of its review, the court must examine “whether the [ITC] has articulated the

requisite rational connection between the facts found and the choice[s] made” in light of the

reasonable indication standard set forth in 19 U.S.C. § 1673b(a). *See Calabrian Corp. v. USITC*, 16 CIT 342, 344–45, 794 F. Supp. 377, 381 (1992) (applying 19 U.S.C. § 1673b(a) (1988)). In making its preliminary determination, "[t]he ITC . . . must decide whether there is a reasonable indication for finding '(1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation.'" *Ranchers-Cattlemen*, 23 CIT at 877, 74 F. Supp. 2d at 1368 (quoting *Am. Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed. Cir. 1986)); *Am. Lamb*, 785 F.2d at 1001 ("[The] ITC has consistently viewed the statutory 'reasonable indication' standard as one requiring that it issue a negative determination . . . only when (1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation.").

DISCUSSION

I.       *The ITC's Findings*

In an antidumping duty investigation, the ITC must preliminarily determine, based on the information available to it at the time, whether there is a reasonable indication that an industry in the United States is materially injured or threatened with material injury by reason of imports of the subject merchandise. 19 U.S.C. § 1673b(a)(1)(A)(i)–(ii).[4] In determining whether there is a

---

[4]      Pursuant to subsection 1673b(a), the ITC shall make a preliminary determination based on the information available to it at the time of the determination, whether there is a reasonable indication that—

(A) an industry in the United States—

(continued...)

reasonable indication of material injury, the ITC shall consider the imports': (1) volume, (2)

effect on prices for the domestic like product, and (3) impact on the domestic industry.  19

U.S.C. § 1677(7)(B)(i)(I)–(III).  Further, the ITC "may consider such other economic factors as

are relevant" to its material injury determination.  19 U.S.C. § 1677(7)(B)(ii).  In addition, the

ITC shall examine whether there is a reasonable indication of threat of material injury, taking

into consideration the relevant factors set forth in 19 U.S.C. § 1677(7)(F)(i).[5]  The presence or

---

[4](...continued)
>> (i) is materially injured, or
>>
>> (ii) is threatened with material injury . . .
>
> by reason of imports of the subject merchandise and that imports of
> the subject merchandise are not negligible.

19 U.S.C. § 1673b(a)(1)(A)(i)–(ii).

[5]     By statute the ITC considers the following factors, "among other relevant economic factors":

> (I) [factor pertaining to countervailable subsidies],
>
> (II) any existing unused production capacity or imminent,
> substantial increase in production capacity in the exporting country
> indicating the likelihood of substantially increased imports of the
> subject merchandise into the United States, taking into account the
> availability of other export markets to absorb any additional
> exports,
>
> (III) a significant rate of increase of the volume or market
> penetration of imports of the subject merchandise indicating the
> likelihood of substantially increased imports,
>
> (IV) whether imports of the subject merchandise are entering at
> prices that are likely to have a significant depressing or suppressing
> effect on domestic prices, and are likely to increase demand for
> further imports,

(continued...)

absence of any statutory factor "shall not necessarily give decisive guidance with respect to the

determination"; however, the ITC's threat determination "may not be made on the basis of mere

conjecture or supposition." 19 U.S.C. § 1677(7)(F)(ii).


By its Preliminary Determination the ITC concluded that there was no reasonable

indication of material injury to the domestic blast furnace coke industry by reason of the

importation of blast furnace coke. *See* Prelim. Determination at 3. In reaching this

determination, the ITC found that competition between the Subject Imports and the domestic like

product was "attenuated," and thus insufficient to serve as a basis for finding material injury. *Id*.

at 9 (finding that "there [was] a reasonable overlap of competition sufficient for cumulation,

while at the same time recognizing the attenuated competition between subject imports and

---

[5](...continued)

> (V) inventories of the subject merchandise,
>
> (VI) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products,
>
> (VII) [factor pertaining to agricultural products],
>
> (VIII) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and
>
> (IX) any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time).

19 U.S.C. § 1677(7)(F)(i)(I)–(IX). In the Preliminary Determination, the ITC considered factors I and VII inapplicable to this antidumping investigation. Prelim. Determination at 22 n.156.

domestically produced blast furnace coke."). In light of that finding, and other findings concerning conditions of competition, the ITC further concluded that the volume, effect on domestic prices, and impact of the Subject Imports were not significant. *Id*. at 18–19, 21. In addition, the ITC determined that there was no reasonable indication that the domestic coke industry was threatened with material injury due to the importation of blast furnace coke. *Id*. at 26.

Plaintiffs challenge the ITC's attenuated competition finding and the ITC's negative determinations with respect to volume, price effect, impact, and threat. Plaintiffs claim that "the majority's attenuated competition conclusion has no rational basis in fact," in particular taking issue with the ITC's findings concerning mode of transportation and product quality. Pls.' Mem. at 25. Plaintiffs further contend that the allegedly erroneous attenuated competition finding is central to the ITC's determinations with respect to material injury and threat, and that "[w]hen it fails, little is left of the rest of the Majority Opinion." *Id*. at 26. The ITC responds that its attenuated competition finding, "which it relied upon both in its material injury and threat of material injury determinations, is supported by clear and convincing evidence." Def.'s Resp. at 16.

A.      *Attenuated Competition*

In the Preliminary Determination the ITC found that competition between the Subject Imports and the domestic like product was "attenuated" for two reasons. First, "a significant

amount of subject imports [was] transported over water[6] and sold directly to steel makers at steel

plants with port facilities," and, thus, the Subject Imports were restricted to delivery at limited

locations and were more economical for the purchaser to receive; and second, "blast furnace coke

transported over water result[ed] in less product deterioration than blast furnace coke transported

over land." Prelim. Determination at 9–10. As a result, the ITC concluded that, for the most

part, the Subject Imports did not compete directly with domestically produced blast furnace coke.

This finding of attenuated competition was an important factor in the ITC's

determinations with respect to the Subject Imports' effect on domestic prices and threat of

material injury. In support of its position with respect to price effect, the ITC stated that the

"nature of the conditions of competition for this industry" confirmed "[t]he lack of significant

adverse price effects by the subject imports . . . ." Prelim. Determination at 19. Further, the ITC

concluded that "[t]here is no evidence on this record that the prices of these imports, *that to a*

*great extent do not compete with domestically produced blast furnace coke*, and which constitute

the overwhelming percent of the subject imports, have had a significant effect on domestic

prices." *Id*. (emphasis added). In support of its position with respect to threat of material injury,

the ITC stated that

> the vast majority of subject imports during the period of
> investigation were destined for [certain domestic steel producers].
> As stated earlier, these . . . steel producers do not generally
> purchase domestically produced blast furnace coke for use at their

---

[6] By "over water" the ITC appears to mean by oceangoing vessel and possibly by "Panamax" vessel. "'Panamax' refers to the maximum dimensions allowable to permit the vessel to go through the Panama Canal . . . ." 2 Thomas J. Schoenbaum, Admiralty & Maritime Law § 10–4, at 29 n.4 (3d ed. 2001).

> steel production facilities with port facilities, reportedly due to the economic advantages of water transport which reduces degradation . . . .

*Id*. at 23.

Case law provides some guidance as to how this court should view the ITC's attenuated competition methodology. In *Committee of Domestic Steel Wire Rope & Specialty Cable Manufacturers v. United States*, 26 CIT __, 201 F. Supp. 2d 1287 (2002), the court reviewed the ITC's final determination that an industry in the United States was neither materially injured nor threatened with material injury by reason of imports of steel wire rope.[7] The ITC had found that although a reasonable overlap of competition existed for purposes of cumulation, competition was nevertheless "attenuated" for purposes of injury "due to quality and product mix issues." Steel Wire Rope From China and India, Inv. Nos. 731-TA-868–869 (Final), USITC Pub. 3406

---

[7]     The court notes that it is applying a different standard of review in the present case from that in *Steel Wire Rope*. In *Steel Wire Rope*, the court reviewed the ITC's final determination to ascertain whether it was "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B) (1994); *see Steel Wire Rope*, 26 CIT at __, 201 F. Supp. 2d at 1291 (citing 19 U.S.C. § 1516a(b)(1)(B) (1994)). Here, the court applies the arbitrary and capricious standard, which requires that "the agency . . . examine the relevant data and *articulate a satisfactory explanation* for its action including a 'rational connection between the facts found and the choice made.'" *Mot. Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)) (emphasis added); *Candle Corp. of Am. v. USITC*, 27 CIT __, Slip Op. 03-40 at 12–13 (Apr. 8, 2003) (quoting *Mot. Vehicle Mfrs. Ass'n*, 463 U.S. at 43); *but see Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 25 CIT __, __, 178 F. Supp. 2d 1305, 1314 (2001) (quoting *Bangor Hydro-Elec. Co. v. FERC*, 78 F.3d 659, 663 n.3 (D.C. Cir. 1996) (bracketing in original)) ("[S]ubstantial evidence and arbitrary and capricious 'connote[] the same substantive standard of review'" in their application to factual issues).

(Mar. 2001) ("Steel Wire Rope Final Determination") at 10.[8]  The court upheld this determination, noting that the ITC had "detailed the reasons why the competition between the subject imports and the domestic like product was 'attenuated,'" i.e., that differences in quality and product mix limited substitutability.[9]  *Steel Wire Rope*, 26 CIT at __, 201 F. Supp. 2d at 1299.  In other words, the court found that although an examination of the four cumulation

---

[8]        The court in *Steel Wire Rope* recognized that the ITC may find a reasonable overlap of competition for cumulation while also finding attenuated competition between the imports and the domestic like product for its injury analysis, as these two inquiries serve different purposes.  *See Steel Wire Rope*, 26 CIT at __, 201 F. Supp. 2d at 1297 (citing *BIC Corp. v. United States*, 21 CIT 448, 964 F. Supp. 391 (1997)) ("[T]wo distinct 'competition' findings are logical and legally permissible."); *see also BIC*, 21 CIT at 455, 964 F. Supp. at 399 ("[L]ike product, cumulation, and causation are functionally different inquiries because they serve different statutory purposes." (citation omitted)).  Generally, for purposes of cumulation the ITC considers four factors in assessing whether the imports compete with each other and with the domestic like product: "(1) the degree of fungibility between products; (2) the presence of sales or offers to sell in the same geographic; (3) the existence of common or similar channels of distribution; and (4) the simultaneous presence of imports in the market."  *Wieland Werke, AG v. United States*, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989); *see also Steel Wire Rope*, 26 CIT at __, 201 F. Supp. 2d at 1292 n.4.  Here, as in *Steel Wire Rope*, the ITC found a reasonable overlap of competition sufficient for cumulation while recognizing that competition was attenuated for purposes of causation.  Prelim. Determination at 9.  No party disputes the ITC's decision to cumulate the Subject Imports.

[9]        In the Steel Wire Rope Final Determination the ITC cited differences in product quality and product mix which led to the conclusion that substitutability between imports of steel wire rope and the domestic like product was limited.  *See* Steel Wire Rope Final Determination at 10–12.  In reaching its decision, the ITC found that one of the reasons the products were not in direct competition was that they could not be used for the same purposes.  The ITC stated:

> Many purchasers and distributors state that only domestic product
> is used for so-called "critical" applications: those in which failure
> of the rope could result in damage, injury, or death.  Similarly,
> various steel wire rope distributors expressed concern over liability
> arising out of any failure by imported steel wire rope they might
> sell, particularly imports from China.

*Id.* at 13–14.

factors supported a cumulation finding, i.e., a reasonable overlap of competition, other factors justified a finding of attenuated competition. *See Steel Wire Rope*, 26 CIT at __, 201 F. Supp. 2d at 1292–93; *see also id*. at 1292 n.4 (quoting Steel Wire Rope Final Determination at 15).

### 1.    *Mode of Transportation*

The ITC found that, during the period of investigation, most sales of the Subject Imports were to U.S. steel producers with blast furnace facilities equipped to receive the imports by water. Prelim. Determination at 11, 12. In light of this finding, the ITC observed: "[I]t is far more economical for purchasers to receive blast furnace coke by vessel than by rail or truck . . . ." *Id*. at 14 & nn.95–96 (citing Duferco Br. at 6–7, 18–19; Duferco Br., Ex. 3, Palmer Aff. ("Palmer Affidavit") at 1–2).[10] The ITC also stated that "imported coke was a viable option only to U.S. customers with ready access to port facilities due to the significance of freight costs. . . . [M]ost U.S. merchant producers of coke were located inland, and so were limited to sales to nearby steel mills." *Id*. & n.97 (citing Conference Transcript, Pub. R. List 1, Doc. 26 ("Tr.") at 85 (Test. of Mr. Bruce Malashevich)[11]). Thus, the ITC found that due to the greater cost of land transport used by the domestic producers and the scarcity of plants with adequate port facilities

---

[10]     In the Preliminary Determination, the ITC combined its mode of transportation and product quality findings, often in the same sentence. For example, in full, this sentence states: "According to one of the Chinese respondents, it is far more economical for purchasers to receive blast furnace coke by vessel than by rail or truck because receiving the coke by water reduces the amount of handling of the coke, which in turn, reduces degradation." Prelim. Determination at 14. For purposes of clarity, the court will analyze these two factors separately.

[11]     On July 20, 2001, the ITC held a public conference and heard testimony from Mr. Malashevich, an economist appearing for the Japanese respondents, among others. *See* Blast Furnace Coke From China and Japan, 66 Fed. Reg. at 35,669.

competition between the foreign and domestic products was limited.

Plaintiffs argue that the attenuated competition finding based on mode of transportation is "factually incorrect." Pls.' Mem. at 5. Plaintiffs maintain that "the preponderance of coke is delivered in modes of transportation identical to those used [to ship] U.S.-produced coke . . . ." *Id*. According to Plaintiffs, "[o]nly one blast furnace . . . receives subject imports by ocean going vessel on the coast," and certain foreign producers' shipments of the Subject Imports involve transporting such imports by land as well as by water. *Id*. at 11. Plaintiffs argue that the percentage of Subject Imports delivered solely by waterborne vessel declined during the period of investigation and that this "necessarily indicates that subject imports delivered not by Panamax vessel, but by comparable modes of transport (barge/rail or both) to that used by the domestic industry sharply increased during the [period of investigation]." *Id*. Thus, Plaintiffs urge the court to find that the ITC's attenuated competition finding based on mode of transportation "has no rational basis in fact . . . ." *Id*. at 25.

In support of its findings with respect to mode of transportation the ITC claimed three sources: (1) the testimony of Mr. Bruce Malashevich; (2) the Duferco Brief; and (3) the Palmer Affidavit. Prelim. Determination at 14 nn.95–97; *see also id.* at 12 n.74 (citing Joint Japanese Br. at 33 n.23).[12] Mr. Malashevich stated, in relevant part:

---

[12] In the Preliminary Determination and in Defendant's Response, the ITC cited, as evidence, certain page ranges in the Duferco Brief and the Joint Japanese Brief without identifying the specific passages that it found persuasive. Thus, as the exact language on which the ITC relied is unspecified, where the court quotes these Briefs, it focuses on the language

(continued...)

> [A]nother condition of competition very pertinent is that furnace coke has a low ratio of value to weight. Differences in freight costs thus weigh heavily in sourcing decisions.[13] As a practical matter, imported coke is a viable option only to U.S. customers with ready access to port facilities. Most U.S. merchant producers of coke, however, are located inland and so are limited to sales for consumption by nearby steel mills.
>
> Trade sources tell me that for the last ten years one of the largest purchasers of subject imports . . . also has been the largest seller of U.S. produced coke on the merchant market. Differences in freight costs presumably lie behind this pattern.

Tr. at 85:14–25 to 86:1. The reasons for relying so heavily on this testimony are unclear. While tending to support the conclusion that waterborne coke can be landed only at particular sites, Mr. Malashevich's testimony does not provide any detail with respect to the claimed differences in freight costs for the transportation of domestic coke in comparison with imported coke. Thus, this testimony fails to provide a basis for the ITC's conclusion that the differences in such costs were "significant." Moreover, Mr. Malashevich offered testimony based on what "[t]rade sources [told] [him]" and concluded that "presumably" freight costs were the reason that a certain domestic steel producer decided to purchase Subject Imports rather than rely on other

---

[12](...continued)
which seems to support the ITC's position. Furthermore, the ITC cited the confidential version of the Joint Japanese Brief as support for the proposition that waterborne transportation resulted in lower costs than land transportation. *See* Prelim. Determination at 12 & n.74; *see also* Joint Japanese Br., Confidential R. List 2, Doc. 13 at 33 n.23. The court has examined the specific footnote in the Brief and finds that the confidential sources cited therein make substantially the same point as is made in publicly available sources elsewhere.

[13]      While the statements might appear to support the ITC's conclusions with respect to waterborne transport, they are so lacking in specificity as to any comparison of freight costs among the various modes of transportation that they fail to provide a "rational nexus between the facts found and the choices made." *See Ranchers-Cattlemen*, 23 CIT at 878, 74 F. Supp. 2d at 1369 (internal quotation omitted).

domestic sources of blast furnace coke.  Given the importance placed on the "significance of

freight costs" in the ITC's finding of attenuated competition, this testimony simply provides

insufficient support for this conclusion.

Next, the ITC cited the Duferco Brief for the proposition that it is "far more economical"

to receive imports by water than by land.  Prelim. Determination at 14 n.95.  Indeed, the ITC

seemingly borrowed the "far more economical" language, which appears in the Preliminary

Determination, from the Duferco Brief:

> Imported Chinese or Japanese furnace coke [is] imported almost
> exclusively to U.S. integrateds that are located at sites that [are]
> accessible to waterway transport.  For example, [one steel
> producer's] plant . . . is located on the water and is set up to receive
> materials by vessel [which] is *far more economical* than to receive
> materials by truck or rail. . . .  Any site that cannot be easily
> accessed by waterway becomes economically prohibited for
> imports because of the additional overland transportation costs by
> truck or rail that are usually more expensive than waterway freight
> costs . . . .

Duferco Br. at 6 (emphasis added).  An examination of the sources cited in the Duferco Brief for

these statements, however, reveals that they fail to substantiate the conclusions reached in the

Brief.  For instance, Mr. Andrew Aloe's testimony, cited in the Duferco Brief as the basis for the

proposition that "[t]he ability to receive materials by water is superior [to] overland transport,"

*see id.*, does not, in fact, indicate any economic benefits accruing to purchasers of the Subject

Imports resulting from waterborne transport, but rather addresses the degradation that results

from handling blast furnace coke:

> [T]raditionally what happens is that when we produce our coke it
> goes directly from a screening station into a rail car directly to the

> customer; [there is a] minimum amount of breakage because . . .
> when . . . blast furnace coke and foundry coke [are] transported
> [they] will break. Every time you move it, every time it drops from
> one belt to another belt, there's going to be breakage.
>
> We don't want to move [the coke] at all, so when we have to put it
> on the ground and inventory it we normally would put it into a
> truck. There's one drop. Then the truck takes it out to where
> you're going to inventory it. He drops it again on the ground, and
> then because you have a pile of coke . . . you use up a vast amount
> of area if you just start laying coke down one truck at a time, so
> you need a high lift operator who then is going to jam his
> shovel . . . into that pile and start building it up . . . .
>
> Every time he does that he's running over it. He's putting that
> heavy piece of equipment into it and you're breaking it up, or
> you're putting it into a conveyor that then takes it up to a varying
> height and it drops, and then again, it's breaking. Just putting it
> down you have breakage.

Tr. at 74:1–23.[14] No other source cited in the Duferco Brief can be said to demonstrate that it is

"far more economical" to receive coke by waterborne transport than by other means. Thus,

because the evidence cited in the Brief does not address any cost advantages resulting from

waterborne transport, the ITC's reliance on the Duferco Brief for its conclusions with respect to

these matters is not justified.

Finally, the ITC cited the Palmer Affidavit as confirmation of its finding that freight costs

played a major role in the U.S. steel producers' preference for the Subject Imports. This

Affidavit states:

> Several key factors are considered by [the domestic steel

---

[14]    The Duferco Brief also cites certain statements made by Mr. Palmer in his Affidavit and during his testimony at the public conference, which are similar in substance. The court addresses such statements below.

> producers] in selecting [their] outside suppliers of blast furnace coke. I believe that these factors are still considered by integrateds and serve to limit the volume of Chinese imports.
>
> First, transportation costs. [Some steel companies] considered the transportation costs for delivering furnace coke from the supplier of their furnaces. [One company's blast furnace steel facility] is located on the water . . . and thus has a bias towards global sourcing. [This facility] is configured to receive large quantities of raw materials more economically by water than by rail or truck. Waterway transport from [another] cokemaking facility to [a waterside facility] is not feasible because of the distance and complicated logistics required.
>
> The same logistics concerns also limit the locations to which imports can be delivered. Ocean vessels usually transport coke in 40,000–50,000 metric ton increments, whereas lake vessels can hold only 18,000 metric tons. It is my understanding that . . . [confidential information omitted].

Palmer Aff. at 1–2. As with Mr. Malashevich's testimony, the Palmer Affidavit contains qualifying language such as "I believe" and "It is my understanding" when discussing the motivation for the domestic steel producers to choose a source for blast furnace coke from outside of the United States. *See id*. While the Palmer Affidavit does suggest that delivery of coke at one specific steel facility could be achieved "more economically by water," this statement cannot support the general conclusion that waterborne transport is "far more economical" than delivery by land. The clear purpose and import of the Palmer Affidavit, and for that matter, Mr. Malashevich's testimony, is that foreign shipments can be off-loaded at limited sites. Their statements, however, do not demonstrate that the domestic producers' means of delivery are somehow limited, nor are they authoritative with respect to cost. No meaningful comparison between the freight costs associated with domestic deliveries and foreign deliveries is provided by the Palmer Affidavit. Thus, taken as a whole, the sources cited by the ITC as support for its

conclusion that it is "far more economical" to receive waterborne Subject Imports than to receive domestic coke by land transport do not rise to the level of "clear and convincing" evidence required by case law. *See Ranchers-Cattlemen*, 23 CIT at 877, 74 F. Supp. 2d at 1368 (quoting *Am. Lamb*, 785 F.2d at 1001) ("The ITC . . . must decide whether there is a reasonable indication for finding '(1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation.'").

> ### 2.     *Product Quality*

In the Preliminary Determination, the ITC found that the Subject Imports, which were transported and delivered by water to U.S. steel producers' port facilities, deteriorated less in transit than domestic blast furnace coke.[15] Prelim. Determination at 9–10. The ITC noted that "purchasing the subject imports through a port facility results in *lower degradation* of the blast

---

[15]       Moreover, the ITC found the following with respect to product quality:

> Blast furnace coke crumbles whenever it is being transported or handled, creating particles of coke called coke breeze. Operators do not want this breeze in their furnaces because it can plug up the blast furnaces. A higher percentage of breeze in a shipment, caused, for example, by the coke being on the ground, can result in a decreased price for the shipment, either because the purchaser discounts the shipment or because the breeze is screened out. Therefore, blast furnace coke producers seek to minimize crumbling or degradation of the blast furnace coke prior to use, by minimizing handling, moving or transporting the coke.

Prelim. Determination at 14 & nn.90–93 (citing Tr. at 46–47; 74–75; 48–49; 51–52, 76); *see also* Def.'s Resp. at 12 (citing Tr. at 75 (Test. of Mr. Richard Boltuck)) ("Coke breaks very easily if it is not handled properly . . . ."); Pls.' Mem. at 4 ("[H]andling, and not mode of transportation, causes degradation.").

furnace coke" and that higher product quality is maintained "[by transporting the Subject Imports] over water rather than over land." *Id.* at 12 & n.74 (citing Duferco Br. at 6–7; Joint Japanese Br. at 33 n.23) (emphasis added); *see also* Def.'s Resp. at 12 ("[T]he record reflects [that] market participants consider water transport easier on blast furnace coke."). The ITC further observed that "receiving the coke by water reduces the amount of handling of the coke, which in turn, reduces degradation." Prelim. Determination at 14 & nn.95–96 (citing Duferco Br. at 6–7, 18–19; Palmer Aff. at 1–2). With these findings as its predicate, the ITC determined that the Subject Imports did not directly compete with the domestic like product on the basis of quality. *See generally id.* at 9–10.

Plaintiffs contend that the record fails to support the ITC's finding that the Subject Imports are less physically degraded when transported and delivered by water. First, Plaintiffs argue that "there is no evidence of record of greater or lesser degradation within transit by mode (Panamax vessel, barge, rail)." Pls.' Mem. at 12. Rather, Plaintiffs claim that frequency of handling is the determinative factor in coke degradation. Plaintiffs cite an exhibit attached to the Joint Japanese Brief, which purports to compare the price for coke that has been handled several times with a hypothetically constructed price of coke that has never been handled. *See* Joint Japanese Br. at 19a, Ex. 11A ("Japanese Exhibit"). Plaintiffs argue that the Japanese Exhibit "is based on the (correct) premise that it is valid to show the effect of handling on product degradation, but that mode of transport does not determine the degree of degradation." Pls.' Mem. at 13. Second, with respect to the impact of degradation on the price of blast furnace coke, Plaintiffs claim that "product difference[s] can account for price differences of up to but not more

than $3 to $5 per metric ton." *Id*. at 13 (discussing testimony of Mr. Drew Bachman).[16]  Finally,

Plaintiffs argue the evidence shows that, in any event, "[p]roduct degradation is only one element

of product quality" and that other factors, such as "chemistry, ash content, and physical

condition," also determine product quality.  *Id*. (citing Staff Report at II-4 to -8); *id*. at 25.

Therefore, Plaintiffs contend that an opportunity should be provided for the distribution of

> [p]urchaser questionnaires requesting purchaser specifications blast
> furnace operational requirements and coke quality tolerances,
> would permit a judgment on the degree to which product quality
> differentiates product usability, geographic coverage, and may or
> may not mitigate price underselling and to what degree . . . .

*Id*. at 25.  Thus, it is Plaintiffs' contention that a likelihood exists that contrary evidence would

arise in a final investigation.  *Id*. at 7.

The ITC counters that "there is record evidence that water transport is easier on blast

---

[16]     Mr. Bachman testified:

> I think first and foremost it must be recognized that coke consumed
> in this country is fungible or considered the same, whether it's
> domestically produced or imported.  These cokes can be blended or
> used alternatively . . . and once the coke is qualified at a user's
> facility these materials are considered interchangeable.
>
> Any differences between coke sources can [be] and are adjusted at
> the user levels through operational mechanisms that vary from user
> to user, whether they're outlined in specific contracts or not.
> Pricing adjustments can also be used.  In our experience, these
> adjustments are minor, I would say in the range of three, four, five
> dollars a ton, and are therefore not sufficient to impact the
> widespread price differential between domestic and imported
> cokes.

Tr. at 27:23–25 to 28:1–11.

furnace coke than overland transportation." Def.'s Resp. at 10. With respect to the effect of degradation on the price of a shipment, the ITC argues that "a high percentage of breeze in a coke shipment can result in a discounted price." *Id*. at 14. In addition, the ITC argues that the Japanese Exhibit does not support Plaintiffs' claim because it "uses the number of times blast furnace coke is handled as a measure of degradation, but never states that all modes of transporting coke cause equivalent levels of degradation." *Id*. at 12. Thus, it is the ITC's contention that "clear and convincing evidence" supports its attenuated competition finding with respect to product quality. *Id*. at 15–16.

In the Preliminary Determination the ITC cited the following evidence to support its findings with respect to product quality: (1) the Duferco Brief; (2) the Palmer Affidavit; and (3) the Joint Japanese Brief. First, in the Duferco Brief, counsel asserted: "The ability to receive materials by water is superior than [sic] overland transport because it reduces the *amount of handling* of the furnace coke, which in turn, reduces the amount of degradation that results from each handling. . . . [O]verland transportation . . . require[s] more handling and result[s] in greater degradation." Duferco Br. at 6 & nn.9–10 (citing Tr. at 74; Tr. at 104) (emphasis added). It is worth noting that this statement supports Plaintiffs' position that handling, not mode of transportation, is the significant factor in coke degradation.[17] Further, the evidence cited in the Duferco Brief, e.g., the testimony of Mr. Aloe, also deals with the deteriorating effects of

---

[17] Indeed, the Preliminary Determination itself states "blast furnace coke producers seek to minimize crumbling or degradation of the blast furnace coke prior to use, by minimizing *handling, moving or transporting* the coke." Prelim. Determination at 14 (emphasis added). This general statement would seem to apply equally to domestically produced coke and the Subject Imports.

repeated handling on blast furnace coke and tends to undermine the ITC's finding that transporting blast furnace coke by water results in less degradation and less coke breeze than transporting it by land. Mr. Aloe's testimony indicates that in the moving, lifting, loading, and unloading of blast furnace coke breakage occurs, and that more, not less, breakage would result from oceangoing transport or delivery:

> [I]t's not an easy thing to offload those [oceangoing] vessels.
>
> It goes into a barge, and then that barge is taken up to some dock.
> It's taken off the dock, and then it's moved from that dock either
> by truck or rail . . . to the ultimate consumer. You'd think with all
> that moving around that [the respondents would] have a substantial
> disadvantage in the marketplace because their ultimate product that
> they're delivering is broken up.

Tr. 80:18–25 to 81:1. In fact, this evidence does not discuss the effect of waterborne transport on the Subject Imports, only delivery. The Duferco Brief also cites the testimony of Mr. Palmer given separate from his affidavit. This testimony merely supports the proposition that it is difficult to transport imports inland, and that "[t]he need for accessible location precludes any significant volume of imports from being delivered to any land-locked locations." Tr. at 104:11–13. Again, the effect of waterborne transport on the quality of the Subject Imports is not mentioned. As the ITC itself concedes that "[c]oke breaks very easily if it is not handled properly," Def.'s Resp. at 12, it is difficult to see how Mr. Palmer's testimony provides much support for the proposition that the Subject Imports are of a higher quality than domestic coke based on mode of transportation. Thus, this evidence does not support the ITC's finding.

Second, although it addresses the question of product quality, the court does not find that

the Palmer Affidavit serves as adequate evidentiary support with respect to the ITC's product quality finding. Mr. Palmer stated that "[o]cean and river transport is more advantageous than overland transport because it requires less handling, which causes degradation of the coke." Palmer Aff. at 2. Mr. Palmer further stated:

> To deliver coke to [a domestic steel producer's blast furnace steel facility] by water, the coke can be transported directly from the ocean vessel and placed at the stockyard located right before the blast furnace. In contrast, to deliver coke to [that facility] by land, the coke is handled many more times and suffers a much higher degradation rate. It is my understanding that . . . [confidential information omitted].

*Id*. The utility of the Palmer Affidavit, however, is limited because: (1) there is no indication that his views are based on firsthand knowledge; (2) the statements that the ITC found convincing with respect to the reasons certain purchasers chose imported coke contain the qualifying language "It is my understanding"; and (3) his statements tend equally to support Plaintiffs' position that it is the frequency with which coke is handled, not necessarily mode of transportation, that leads to product degradation.

Finally, contrary to the argument made by the ITC in its Response, the evidence cited in the Joint Japanese Brief does not tend to prove the assertion that water transport is "gentler" on blast furnace coke than land transport. *See* Def.'s Resp. at 11. The Brief cites the testimony of Mr. Ryu Hasegawa who stated that Mitsui and Mitsubishi have "specialized equipment to load blast furnace coke onto Panamax vessels with minimal breakage." Tr. at 99:14–15. However, Mr. Hasegawa's testimony deals with loading, not transport or delivery. Moreover, neither the Brief nor the evidence cited in the Brief makes any meaningful comparison between domestic

and foreign methods of loading blast furnace coke "gently."

Notably absent from the record is any real evidence that directly supports the ITC's finding that the Subject Imports are superior in quality to the domestic like product. On the contrary, there is at least some evidence provided in the Staff Report that the domestic like product is superior in quality to the Subject Imports. According to the Staff Report:

> U.S. producers and importers were asked if there are any differences other than price between U.S.-produced blast furnace coke and blast furnace coke produced in China and Japan that are significant factors in their sales of blast furnace coke. According to U.S. producers, the domestic blast furnace coke is superior to imported blast furnace coke in terms of quality, but when foreign prices are far below domestic prices, blast furnace operators are reportedly willing to sacrifice some quality for the cheaper imports. Responding importers stated that domestic and imported coke characteristics are different; however the integrated steel makers reportedly need to import blast furnace coke because their demand for blast furnace coke has consistently been much greater than the available domestic supply.

Staff Report at II-4. Also, with respect to substitutability, the Staff Report indicates that "[t]he degree of substitution between U.S.-produced and imported blast furnace coke depends upon such factors as relative price, quality, and availability."[18] *Id*. Taking these factors into

---

[18]    There is record evidence that price is an important, though not necessarily determinative, consideration:

> Price is an important factor in the sale of blast furnace coke, however other factors such as quality, availability, and reliability of supply are significant factors in purchase decisions. Suppliers generally compete on price only if their product has been tested and deemed as consumable by the end user.

Staff Report at II-4.

consideration, the Staff Report concluded that "there is a high degree of substitution between domestic and imported blast furnace coke." *Id.*; *cf. Steel Wire Rope*, 26 CIT at __, 201 F. Supp. 2d at 1300 ("The Commission's 'attenuated' competition finding was critical to the material injury determination because the difference in product quality and mix, coupled with the *low substitutability* of the subject imports with the domestic like product showed that the domestic industry was not injured by the subject imports." (emphasis added)). In addition, as noted by the dissenting Commissioners, and as evidence on the record suggests, it would appear that the interchangeability between the Subject Imports and the domestic like product is a critical factor in the material injury and threat evaluations.[19] *See* Dissenting Views of Commissioners Bragg and Miller, Prelim. Determination at 27 n.1 ("Given that the record indicates that subject imports and the domestic like product are interchangeable and recognizing an important issue raised regarding the nature of competition between subject imports and the domestic like product, i.e., whether transportation costs limit U.S. merchant producers' sales to nearby purchasers, we believe that negative determinations at this preliminary stage would be premature. The record does not, at this time, present information sufficient to support dispositive distinctions regarding the industry's performance, as reflected in the lack of purchaser input regarding the nature of

---

[19]     In its analysis of the fungibility of domestic and imported blast furnace coke, the ITC found "a sufficient level of physical interchangeability between domestically produced and imported blast furnace coke from China and Japan" for purposes of cumulation. Prelim. Determination at 10. This court has held that fungibility plays an important role in the ITC's causation analysis. *BIC*, 21 CIT at 456, 964 F. Supp. at 400 (citing *Gen. Mot. Corp. v. USITC*, 17 CIT 697, 711–12, 827 F. Supp. 774, 787–88 (1993)) ("[T]he more fungible two products are the more likely underselling by one will affect the price of the other."). While the factors which the ITC considered in deciding whether to cumulate the Subject Imports, i.e., fungibility, geographic overlap, simultaneous presence in the market, and channels of distribution, are not determinative of the attenuated competition finding, here they would appear to be relevant.

competition between the domestic product and imported product, particularly in the sizable

merchant segment.").

Although the scope of judicial review of an ITC preliminary injury determination is a

narrow one, the ITC must nonetheless explain the reasons behind its determination. *See Bowman*

*Transp.*, 419 U.S. at 285–86; *Mot. Vehicle Mfrs. Ass'n*, 463 U.S. at 43 ("[T]he agency must

examine the relevant data and articulate a satisfactory explanation for its action . . . ."). Here,

unlike in *Steel Wire Rope*, the ITC has not "detailed the reasons why the competition between the

subject imports and the domestic like product was 'attenuated.'" *Steel Wire Rope*, 26 CIT at __,

201 F. Supp. 2d at 1299. Moreover, contrary to the ITC's claim, the "clear and convincing"

standard, which the ITC has long applied as the measure of evidence required before it may issue

a negative determination, *see Am. Lamb*, 785 F.2d at 1001, is not met based on the evidence cited

in the Preliminary Determination. Thus, the ITC has failed to demonstrate that there is a

reasonable indication that the record on the whole contains "clear and convincing evidence that

there is no material injury or threat of such injury" to the domestic blast furnace coke industry,

and that "no likelihood exists that contrary evidence will arise in a final investigation." *See id.*

Where an agency has not articulated a rational connection between the facts found and the

choices made, remand is appropriate. *See Burlington Truck Lines*, 371 U.S. at 168; *Altx, Inc. v.*

*United States*, 25 CIT __, __, 167 F. Supp. 2d 1353, 1367–68 (2001) (quoting *Bando Chem.*

*Indus., Ltd. v. United States*, 16 CIT 133, 136, 787 F. Supp. 224, 227 (1992)). The ITC has not

adequately articulated its reasons for finding that competition between the Subject Imports and

the domestic like product is attenuated—indeed, it is not clear from the Preliminary

Determination at what point competition becomes "attenuated"—nor does the evidence cited by

the ITC, with respect to its mode of transportation and delivery and product quality findings,

demonstrate that, in fact, direct competition does not exist. *See Bowman Transp.*, 419 U.S. at

285–86 (court may not "supply a reasoned basis for the agency's action that the agency itself has

not given."); *Altx*, 26 CIT at __, Slip Op. 02-154 at 4 ("The court can only review the reasoning

that the Commission expresses."). Thus, as there is no "rational connection between the facts

found and the choice[s] made," the court must remand this matter to the ITC so that it may

explain this finding. *Burlington Truck Lines*, 371 U.S. at 168.


Accordingly, on remand the ITC shall revisit its Preliminary Determination, and, should it

conclude that a negative determination continues to be warranted, revisit its conclusions with

respect to its attenuated competition finding and: (1) explain the methodology and standards

employed in reaching the conclusion that "to a great extent [Subject Imports] do not compete

with domestically produced blast furnace coke," Prelim. Determination at 19; (2) state with

specificity the factors underlying its finding of attenuated competition; (3) state whether U.S.

purchasers of Subject Imports comprise a separate market and cite the record evidence to support

such conclusion, if any; (4) state with specificity any record evidence demonstrating that lower

costs resulting from waterborne transport of the Subject Imports created a separate market for the

Subject Imports; (5) state with specificity any record evidence demonstrating that it is "far more

economical" for Subject Imports to be delivered by waterborne transport when compared with

modes of transportation available to the domestic like product; (6) quantify the cost differences

resulting from waterborne transport and delivery of the Subject Imports when compared with the cost of transport of the domestic like product; (7) state the percentage of Subject Imports unloaded directly from Panamax vessels and other oceangoing ships directly for use in the United States; (8) state with specificity any record evidence demonstrating that the superior quality resulting from waterborne transport or delivery of the Subject Imports created a separate market for the Subject Imports; (9) examine the significance of the manner and frequency of handling of the Subject Imports in its product quality analysis; (10) state with specificity any record evidence demonstrating that the Subject Imports are superior in quality to the domestic like product and specify in what way the Subject Imports are superior; (11) state with specificity any record evidence demonstrating a preference on behalf of U.S. blast furnace coke consumers for the Subject Imports based on product quality; and (12) state with specificity any record evidence that the Subject Imports and the domestic like product are not fungible.

CONCLUSION

For the reasons set forth above, the court remands this matter to the ITC for further proceedings in accordance with this opinion. Such remand results are due within ninety days of the date of this opinion, comments are due thirty days thereafter, and replies to such comments eleven days from their filing.

_____
                                   Richard K. Eaton

Dated: May 20, 2003
          New York, New York